[Civ. No. 50512. Second Dist., Div. Four. Dec. 15, 1978.]

KAISER FOUNDATION HOSPITALS et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
ROBERT GREGORY et al., Respondents.

[Civ. No. 50671. Second Dist., Div. Four. Dec. 15, 1978.]

KAISER FOUNDATION HOSPITALS et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
GEORGE ALBERT JONES et al., Respondents.

[Civ. No. 50798. Second Dist., Div. Four. Dec. 15, 1978.]

KAISER FOUNDATION HOSPITALS et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
SEVER M. LONE et al., Respondents.

[Civ. No. 50921. Second Dist., Div. Four. Dec. 15, 1978.]

KAISER FOUNDATION HOSPITALS et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
CARL SMITH et al., Respondents.

338

340

**COUNSEL**

Thelen, Marrin, Johnson & Bridges, James W. Baldwin, Robert W. Loeffler and Walter A. Stringfellow III for Petitioners.

Lional K. Hvolboll as Amicus Curiae on behalf of Petitioners.

Banks & Leviton, Banks, Leviton & Kelley, Eugene Leviton, Seth J. Kelsey, David Kristjanson, Mansell & Arthur, Mansell, Manchester, Dean & Long, Stafford R. Leland, James J. Vonk, George S. Bjornsen, Arthur Hershenson, Frank Evans, Robert M. Jakob, Thomas J. McBirnie, Philip M. Miyamoto, Richard W. Younkin, Charles L. Swezey, Frank H. Batlin, William B. Donohoe, Dexter W. Young, Rose, Klein & Marias, Howard N. Lehman, Olney, Levy, Kaplan & Tenner, Barry J. Burger, Leland, Rosner, Samuelsen, Whitehead, Benes & Ringwalt, William A. Parsons, Silver & McWilliams and Bernard Katzman for Respondents.

Warren L. Hanna as Amicus Curiae on behalf of Respondents.

## OPINION

**KINGSLEY, J.**—We have consolidated these four cases for hearing and decision because they all involve problems of the constitutionality and application of section 4903.1 of the Labor Code.[1] That section, added by chapter 1109, Statutes of 1975, provides as follows:

"The appeals board, before issuing its award or approval of any compromise of claim, shall determine, on the basis of liens filed with it, whether any benefits have been paid or services provided by a health care service plan, a group disability policy, a self-insured employee welfare benefit plan, or a hospital service contract, and its award or approval shall provide for reimbursement for benefits paid or services provided under such plans as follows:

"(a) When the referee issues an award finding that an injury or illness arises out of and in the course of employment, but denies the applicant reimbursement for self-procured medical costs solely because of lack of notice to the applicant's employer of his need for hospital, surgical, or medical care, the appeals board shall nevertheless award a lien against the employee's recovery, to the extent of benefits paid or services provided, for the effects of the industrial injury or illness, by a health care service plan, a group disability policy, a self-insured employee welfare benefit plan, or a hospital service contract.

"(b) When the referee issues an award finding that an injury or illness arises out of and in the course of employment, and makes an award for reimbursement for self-procured medical costs, the appeals board shall allow a lien, to the extent of benefits paid or services provided, for the effects of the industrial injury or illness, by a health care service plan, a group disability policy, a self-insured employee welfare benefit plan, or a hospital service contract.

"(c) *When the parties propose that the case be disposed of by way of a compromise and release agreement, in the event the lien claimant does not agree to the amount allocated to it, then the referee shall determine the potential recovery and reduce the amount of the lien in the ratio of the applicant's recovery to the potential recovery in full satisfaction of its lien claim.*" (Italics added.)

---

[1] Unless otherwise specified, all statutory references herein are to the Labor Code.

Petitioner, Kaiser Foundation Hospitals, and its affiliate, Southern California Permanente Medical Group (Kaiser) admittedly are the kind of provider of medical services referred to in that section. They provided medical and hospital services to the individual workmen involved in these four cases. In all four cases, the injured workmen and their respective employers (and the employers' insurance carriers[2]) agreed to settle and compromise the claims of the workers. In each case Kaiser had filed claims for its services and the Workers' Compensation Insurance Board had reduced the amount of those liens[3] in reliance on subdivision (c) of section 4903.1.

We approach the issues before us with certain facts in mind:

(1) Although the record before us does not contain the text of the contract between Kaiser and the four workmen herein involved, the cases have been briefed, and we therefore assume, that those contracts obligated Kaiser to provide (within what monetary limits they contained) reimbursement to the workmen for all medical costs not arising out of industrial causes, but excluded from Kaiser's obligation medical costs arising out of industrially caused injuries or illness.[4]

(2) Section 4903.1 applies only to cases involving self-procured medical services. If an employer, as is often the case, has provided services by its own medical supplier, that supplier recovers from the employer on the contract between them, irrespective of the result of the workman's case before the board.

(3) If, as subdivision (b) of section 4903.1 assumes, the board determines that the self-procured services were obtained by the workman after compliance with the statute and cases permitting self-procured

---

[2]Hereinafter the term "employer" refers also, so far as applicable, to the employer's insurance carrier.

[3]In any case, the board, in acting on a claim for lien by a medical provider, must make a preliminary determination as to the gross amount to be taken into consideration. That determination permits reduction of a claim for services not related to the claimed industrial injury and for a claim deemed by the board to be unreasonable in amount. In the cases at bench, the petitions for review did not question the gross amount used by the board in its calculations; however, on the remand that we order, the parties may, if otherwise permitted by the rules of the board, litigate that issue if they so desire.

[4]We are advised that in some group policies the exclusion is for all such medical expenses and in others only for such amount as is not recovered in a case before the board. That difference, although important to the insured and the insurer, is immaterial to the issues here before us.

medical services,[5] the provider is awarded a lien for the full amount of its claim (as adjusted as discussed in fn. 3) in addition to the award to the workman for the other benefits to which he is entitled. In such a case, if the workman does obtain an award for such other benefits, the award will serve to satisfy the claim in full.

(4) If, as is assumed in subdivision (a) of section 4903.1, the workman has not met the requirements for validly self-procured medical services, any award to the workman will not include any increment for medical services, but the provider still has a lien against the award for the other benefits. In such a situation, it is possible that the legitimate claim of the medical provider may exceed the award to the workman, leaving the provider only to such rights against other assets of the workman as its contract with him allows.

(5) Apart from subdivision (c) of section 4903.1, a medical supplier would, even in the case of a compromise settlement, have a lien for the full amount of its adjudicated claim, although that lien might not be satisfied in full out of the compromise award, leaving the supplier to such other remedy against the workman as its contract with him allowed. (*Kaiser Foundation Hospitals* v. *Workmen's Comp. Appeals Bd. (Keifer)* 13 Cal.3d 20 [117 Cal.Rptr. 678, 528 P.2d 766].)

Kaiser contends: (1) that section 4903.1 is vague and ambiguous and operates to deny Kaiser due process of law; (2) may not be retroactively applied to cases such as these where the medical services were provided prior to the effective date of the statute; (3) the particular manner in which section 4903.1 was applied in these cases denied Kaiser due process of law; and (4) that the section denied to Kaiser the equal protection of the laws.

We hold: (1) that, as construed herein provided, and applied as we herein direct, the section is not unconstitutionally vague; (2) that the section applies to those cases of liens specified in it even where the services were provided before the effective date of the statute provided the compromise settlement was reached after that effective date; and (3) that, in three of the cases before us, there is no unconstitutional denial of equal protection, but that, in one case, there is a denial of equal

---

[5]See Labor Code, section 4600; *Granado* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399 [71 Cal.Rptr. 678, 445 P.2d 294]; *McCoy* v. *Industrial Acc. Comm.* (1966) 64 Cal.2d 82 [48 Cal.Rptr. 858, 410 P.2d 362]; 2 Hanna, California Law of Employee Injuries and Workmen's Compensation (2d ed. 1977) section 16.01[1], footnote 1.

protection. However, for reasons stated below, we hold that Kaiser was denied due process by the manner in which section 4903.1 was applied in these cases.

*Background of Section 4903.1*

Section 4904[6] and 4903.1 share somewhat of a common history. In order to fully understand section 4903.1, one must review part of the history of section 4904.

Section 4904 was amended in 1957 to change the rulings in *Bryant v. Industrial Acc. Com.* (1951) 37 Cal.2d 215 [231 P.2d 32] and *Aetna Life Ins. Co. v. Industrial Acc. Com.* (1952) 38 Cal.2d 599 [241 P.2d 530], regarding liens filed by the Employment Development Department for unemployment compensation disability (hereinafter U.C.D.) benefits paid to an injured. (*California-Western States Life Ins. Co. v. Industrial Acc. Com. (Baird)* (1963) 59 Cal.2d 257, 262 [28 Cal.Rptr. 872, 379 P.2d 328].)

*Bryant* involved a findings and award of the Industrial Accident Commission (now called the Workers' Compensation Appeals Board) that a U.C.D. lien covered both the temporary and permanent disability allowance of the award. The court in *Bryant* held that, since the U.C.D.

---

[6]Section 4904: "If notice is given in writing to the insurer, or to the employer if uninsured, setting forth the nature and extent of any claim that is allowable as a lien, the claim is a lien against any amount thereafter payable as compensation, subject to the determination of the amount and approval of the lien by the appeals board. In determining the amount of lien to be allowed for unemployment compensation disability benefits under subdivision (f) of Section 4903 the appeals board shall allow such lien in the amount of benefits which it finds were paid for the same day or days of disability for which an award of compensation for temporary disability indemnity is made. In determining the amount of lien to be allowed for unemployment compensation benefits and extended duration benefits under subdivision (g) of Section 4903, the appeals board shall allow such lien in the amount of benefits which it finds were paid for the same day or days for which an award of compensation for temporary total disability is made. In the case of agreements for the compromise and release of a disputed claim for compensation, the applicant and defendant may propose to the appeals board, as part of the compromise and release agreement, an amount out of the settlement to be paid to any lien claimant claiming under subdivision (f) or (g) of Section 4903. The determination of the appeals board, subject to petition for reconsideration and to the right of judicial review, as to the amount of lien. allowed under subdivision (f) or (g) of Section 4903, whether in connection with an award of compensation or the approval of a compromise and release agreement, shall be binding on the lien claimant, the applicant, and the defendant, insofar as the right to benefits paid under the Unemployment Insurance Code for which the lien was claimed. The appeals board may order the amount of any lien claim, as determined and allowed by it, to be paid directly to the person entitled, either in a lump sum or in installments. . . ."

lien by the language of section 4904 applied against amounts paid as "compensation" and since "compensation" includes permanent disability payments, the lien properly attached to the entire workers' compensation award for disability benefits paid during the uncertain period pending final determination by the commission.

In *Aetna, supra,* the commission denied a U.C.D. lien stating that the amount payable under a compromise agreement to the disabled employee was not "workers' compensation" subject to the lien. The court in *Aetna* held the employee was not entitled to U.C.D. benefits for a period of employment caused by a disability for which he is entitled to workers' compensation, and, accordingly, held that, where the disabled employee and the employer settle the claim by compromise and release, the commission should determine the period of disability for which the employee is entitled to compensation and allow the claimed lien for the amount of unemployment disability benefits paid during that period.

In 1957, the Legislature amended section 4904 and altered in substance the holding of *Bryant* and *Aetna.* (Stats. 1957, ch. 1977, § 2, p. 3524.) Also, the amendment manifested the Legislature's purpose to distinguish between the method of disposition of liens for unemployment compensation disability benefits in cases in which findings and an award are rendered and those in which compromise agreements are effected. (*Baird, supra,* 59 Cal.2d at p. 264.) Under the amendments, where the board finds the injury industrial, the U.C.D. lien is honored to the extent that the temporary disability from the injury coincided with the dates U.C.D. benefits were paid. However, in cases of disputed injury, where there is a settlement by compromise and release, the 1957 amendments allowed the reduction of the U.C.D. lien in relation to the settlement. (*Ibid.*)

In *Baird,* the Supreme Court held that section 4904 as amended in 1957 did not deprive the lien claimant of procedural due process since the lien claimant has the right to seek reconsideration and judicial review. (*Baird, supra,* 59 Cal.2d at p. 266.) The court in *Baird* also noted that the lien claimant was notified of the hearing at which the adequacy of the allowance on its lien was determined. (*Ibid.*)

As we have pointed out above, in *Kaiser Foundation Hospitals* v. *Workmen's Comp. Appeals Bd. (Keifer)* (1974) 13 Cal.3d 20 [117 Cal.Rptr. 678, 528 P.2d 766], the court was faced with the question of whether the board had authority to reduce the size of an otherwise proper medical or

hospital services lien (see Lab. Code, § 4903, subd. (b)) upon an injured employee's compensation recovery (a settlement) on the ground that such reduction would be "fair and equitable" in light of a compromise and release of the employee's compensation claims with the employer and his insurer. The board held that the 1957 amendments to section 4904 gave the board an implied authority to reduce the liens in question. The court concluded that, in the absence of the lienholder's consent, the board has no authority to reduce a valid lien for proper medical or hospital services solely to accommodate such settlement. (*Keifer, supra,* 13 Cal.3d at p. 23.)

In 1975, the Legislature enacted Labor Code section 4903.1, which permitted that which *Keifer* ruled improper.

At the outset of this court's analysis of the effect of subdivision (c) of section 4903.1, we note that substantially similar questions as presented by Kaiser here were made by the petitioners before the First Appellate District in *Kaiser Foundation Hospital* v. *W.C.A.B. (Souza)* (1977) 42 Cal.Comp.Cases 512, where a writ of review was denied by the First Appellate District and the Supreme Court denied a hearing. The denial of a petition for writ of review and/or the denial of hearing by our Supreme Court do not necessarily indicate the appellate courts' agreement with the board's decision regarding the issues presented. (Cf. *Prescod* v. *Unemployment Ins. Appeals Bd.* (1976) 57 Cal.App.3d 29, 39 [127 Cal.Rptr. 540].) Thus we must undertake an independent review of the issues presented by Kaiser.

I

*The Retroactivity Issue*

Kaiser contends that section 4903.1 does not apply to medical services provided before the effective date of section 4903.1—i.e., before January 1, 1976. Kaiser argues that the retroactive application of the statute violates the due process and would be an impairment of contract.

The board's view is that Kaiser's lien was not a "vested right" since the board had not approved the lien at the time the statute became effective; therefore, there was no due process objection to section 4903.1, subdivision (c) being "retroactively" applied. Further, relying chiefly on *Harrison* v. *Workmen's Comp. Appeals Bd.* (1974) 44 Cal.App.3d 197 [118 Cal.Rptr. 508], the board found that subdivision (c) was intended by the

Legislature to have retroactive effect in order to effectuate immediate legislative reversal of the court's decision in *Keifer.*

The question of the constitutionality of retroactive legislation and the question of retroactivity are distinct. (*Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393-394 [182 P.2d 159].) Thus, the initial issue is whether section 4903.1 is retroactive and, if so, whether it can constitutionally be retroactive. Once that is determined, the intent of the Legislature must be examined on whether it was desired to make section 4903.1 apply to medical services provided prior to January 1, 1976.

In *Lohman* v. *Barker Bros. Corporation* (1957) 22 Cal.Comp.Cases 247, the commission was faced with the question of whether the 1957 amendments to Labor Code sections 4903 and 4904 were retroactive and permitted the reduction of U.C.D. liens for benefits provided *before* the effective date of the amendments. In *Lohman,* the commission stated: "The Commission, en banc, has concluded that the statutes which have been amended are procedural and therefore apply to existing causes of actions and defenses. We are of the opinion that the right of the petitioner to a lien did not attach until the employee effected a recovery. See *Record* v. *Industrial Indemnity Company* [*sic*] (1951) 103 Cal.App.2d 434, 229 P.2d 851, 16 Cal.Comp.Cases 132. The petitioner had no lien rights until they became fixed as of the date of the original decision herein on September 20, 1957. On that date the petitioner's lien rights extended to temporary disability indemnity only. The applicant was awarded temporary total disability indemnity for a period that began February 22, 1955 and ended July 31, 1955. The Department of Employment will be granted a lien for the payments they made during that period. . . ."

*Record* v. *Indemnity Ins. Co., supra,* 103 Cal.App.2d 434, cited in *Lohman,* involved the Legislature's 1949 amendments to section 3856 which provided that in a third party action brought by the injured where the employer has a lien for workers' compensation benefits provided to the injured and the employer has not joined in the action and is not represented by an attorney, the court shall fix an attorney's fees payable by the employer to the injured's attorney out of the employer's recovery on his lien. Prior to 1949, there was no such provision regarding attorneys' fees. In *Record* the injured's attorney sought a fee out of the employer's recovery regarding a settlement reached *after* the effective date of the amendments. The court reasoned there was no retroactive application since the amendments were applied to a settlement made after the

amendments became effective. In *Record* the respondent, who was the employer's carrier, made arguments of unconstitutionality and impairment of contract. (*Record* v. *Indemnity Ins. Co., supra,* 103 Cal.App.2d at p. 443.) At page 444 the court stated:

"This law does not give a previous transaction some different legal effect from that which it had under the law when it occurred. It does give a different effect to a future failure to join in or contribute to the employee's action—but this new obligation is not based on a past transaction but rather on a future omission. Such a statute is necessarily prospective in its operation. (See *City of New York* v. *Foster,* 148 App.Div. 258 [133 N.Y.S. 152, 155].)

"Furthermore, . . . [i]n California the liability under the Workmen's Compensation Act is incident to the status of employment and is neither in tort nor in contract. (*Quong Ham Wah Co.* v. *Industrial Acc. Com.,* 184 Cal. 26 [192 P. 1021, 12 A.L.R. 1190].) *Regardless of what this basic relationship is termed, the employer's right to reimbursement, credit, or lien does not attach until the employee effects a settlement or recovers a judgment against a third party. Until then any theoretical contingent 'rights' are at best inchoate. It is the recovery which fixes the employee's obligation to reimburse and, under the situations described in the amendment, the employer's duty to contribute—just as . . . it is the date of injury which fixes and defines the employer's obligation to compensate.*" (Italics added.)

Applying *Record* here it would appear that Kaiser's liens are merely "theoretical contingent rights" which are "at best inchoate." Here it is the date of the settlement which determines whether a lien may be reduced, just as in *Record* it was the date of the settlement that determined whether the employer's lien was subject to Labor Code section 3856 as in effect at the time of settlement.

Similar in effect is *Jenkins* v. *Workmen's Comp. Appeals Bd.* (1973) 31 Cal.App.3d 259 [107 Cal.Rptr. 130]. There the injured sustained an industrial injury on February 19, 1971. On March 3, 1972, the board awarded the injured temporary disability. On March 4, 1972, Labor Code section 3716 became effective. Labor Code section 3716 established a state approved fund (the Uninsured Employers Fund) which was to provide immediate compensation benefits if the employer failed to pay an award. The court held the payment of benefits from the Uninsured Employers Fund was in order even though the date of injury was before

the effective date of the statute. The court stated: "The provision [Lab. Code, § 3716] does not create a new right having its origin in the initial injury. Rather, the right created is based upon the fact of nonpayment of an obligation already in existence, i.e., the award of compensation. It is this time (nonpayment within 10 days of entry of award), and not the time of injury, that effectuates section 3716. For this reason, the section is not, in effect, applied retroactively when an employee, whose award is subsequent to its effective date, is given the benefit of the statute." (*Jenkins* v. *Workmen's Comp. Appeals Bd., supra,* 31 Cal.App.3d 259, 263.)

The court in *Jenkins* went on to say that the injured prior to March 4, 1972, only had an "inchoate right to compensation" and "[o]nly when the award of compensation was made . . . did a vested right to collection and payment accrue." (*Jenkins* v. *Workmen's Comp. Appeals Bd., supra,* 31 Cal.App.3d at p. 264.) Thus, the court reasoned, "it cannot be argued that the law is being applied retroactively." (*Ibid.*)

Thus, subdivision (c) of section 4903.1 when applied to all cases where settlement was not reached prior to January 1, 1976, is not being unconstitutionally retrospectively applied. Such an application of the statute is actually prospective from a constitutional point of view since Kaiser had no vested rights until a settlement was reached.

Nothing in *Keifer, supra,* 13 Cal.3d 20, establishes that Kaiser had a "vested right" prior to settlement. In *Keifer* the Supreme Court concluded that the lien in question could not be reduced once the lien claimant had established a "prima facie" case. (*Id.,* at p. 28.) A "prima facie" case was stated to be sufficiently established "by submitting evidence that the lien arose by reason of services rendered the employee in connection with an injury or event for which the employee claimed and is awarded compensation under a compromise agreement." (*Id.,* p. 28, fn. 8.) Thus, *Keifer* does not support the view that Kaiser's lien was vested prior to the time settlement was effected.

We now turn to the issue of whether section 4903.1, subdivision (c) was intended by the Legislature to apply only to medical services provided after January 1, 1976. That is, while section 4903.1 can be constitutionally applied to Kaiser's lien, the question is whether the Legislature so intended it to apply.

In determining how the Legislature intended section 4903.1, subdivision (c) to apply, we are mindful of the rule that, in this regard, a statute must be interpreted so as to effectuate legislative intent. (*Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686-687 [91 Cal.Rptr. 585, 478 P.2d 17]; *Harrison* v. *Workmen's Comp. Appeals Bd., supra,* 44 Cal.App.3d 197, 204.)

In *Harrison* v. *Workmen's Comp. Appeals Bd., supra,* 44 Cal.App.3d 197, it was held that Labor Code section 5500.5, as amended effective January 1, 1974, could be applied to claims arising out of injuries before the effective date of the amendment even though the Legislature used no language manifesting such an intent. Prior to the amendment, effective January 1, 1974, Labor Code section 5500.5 codified the rule announced in *Colonial Ins. Co.* v. *Industrial Acc. Com.* (1946) 29 Cal.2d 79 [172 P.2d 884], which allowed an employee in continuous trauma or occupational disease cases to recover against any one of many employments even though many employments may extend into the past for several decades and in allowing contribution and apportionment among such employments. (*Harrison* v. *Workmen's Comp. Appeals Bd., supra,* 44 Cal.App.3d 197, 199.)

The board in *Harrison* noted problems which developed under the *Colonial* rule and these were noted by the court in its opinion:

"For example, the serious difficulties encountered by the parties in complying with the requirements of former section 5500.5 whereby employees and their attorneys were frequently compelled to expend much time, effort and money in tracing the applicant's employment history over the entire course of his adult life. Fading memory, bankrupt or dissolved firms, and record destruction would often make this job difficult if not impossible. Untoward delay would result in attempting to secure such records. Likewise, even where some records were available from the Social Security Administration, such records would often be incomplete, and substantial delay would invariably result while awaiting federal administrative response to requests for additional information.

"Preparing the application in compliance with such requirements became a difficult chore. When the employment history was collected, the applicant and his attorney then faced the difficult and expensive task of describing the names and addresses of the employers, the places of employment and the periods of employment in the application form.

Further, the expense of reproducing the application forms and serving them by mail upon scores of employers was often placed upon the employee, constituting an additional burden upon the litigation of these claims.

"Tracing insurance coverage for the many employers who might be involved in such claims presented a virtually impossible task for the agency and for the parties involved in the claims. When a claim involving multiple employers and carriers finally reached the hearing stage, proceedings were often grossly encumbered by milling numbers of attorneys in the corridors and hearing rooms representing the numerous carriers and employers in the suit, each of whom had a right to appear and cross-examine the applicant and his witnesses. . . ." (*Harrison, supra,* 44 Cal.App.3d at p. 200.)

Labor Code section 5500.5, as amended effective January 1, 1974, limited liability to employers who employed the injured during the five-year period preceding the date of injury or the last date of occupational exposure to the hazards involved, whichever occurred first. In *Harrison* the court noted that the amended legislation was designed and introduced for the purpose of ameliorating the procedural morass which faced the board in multiple defendant cases. The court found it was "evident that the object of [the] legislation will not be effectuated unless the board is permitted to apply the amendment retrospectively as well as prospectively." (*Harrison, supra,* 44 Cal.App.3d 197, 205-206.)

Here, the board argues *Harrison* is analogous to the passage of section 4903.1. In its opinion and decision after reconsideration, the board points out the purpose of section 4903.1 was to alleviate an immediate situation caused after the *Keifer* decision similar to that in *Harrison*: "Faced with a situation in which the law did not provide the Board with this power and considering the overriding intent of the workers' compensation laws to provide proper benefits to an injured worker as quickly and inexpensively as possible, the Legislature in its next session passed 4903.1. This legislation was meant to facilitate and provide for the expeditious handling of workers' claims, by stopping lien holders from thwarting the efforts of both applicants and defendants to compromise. Without Section 4903.1, lien holders could force cases to trial where both parties were in agreement and desirous of settling. The Legislature, faced with *Keifer* and aware of the adverse effect on workers' rights due to that decision, quickly passed curative legislation to rectify the problem."

As did the court in *Harrison,* regarding section 5500.5, we can appropriately rely upon the board to advise on the procedural problems sought to be cured by legislation. We find the board's analysis persuasive and we hold that section 4903.1 was intended to have immediate effect and apply to liens where settlements were not reached prior to January 1, 1976.

## II

### *The Vagueness Issue*

In arguing that section 4903.1 is ambiguous and hence denies due process, Kaiser raises the following questions:

(1) By what mechanism, at what level, and on the basis of what evidence does the appeals board make the determination?

(2) What procedure must a lien claimant follow to register his disagreement with the "allocation" to him in the proposed compromise and release?

(3) Does the lien reduction procedure apply in all cases?

(4) At what point in the proceedings is "potential recovery" to be determined?

(5) How is the reduction formula to be calculated and what express findings must the Board make to arrive at "potential recovery"?

Since each of these "questions" is interrelated, they can be best answered by a unified analysis of the procedures under subdivision (c) of section 4903.1.

Subdivision (c) of section 4903.1 explicitly states: "When the parties propose that the case be disposed of by way of compromise and release agreement, in the event the lien claimant does not agree to the amount allocated to it, then the referee shall determine the potential recovery and reduce the amount of the lien in the ratio of the applicant's [injured's] recovery to the potential recovery in full satisfaction of its lien claim."

Complementary to subdivision (c) is section 10886 of the Workers' Compensation Appeals Board Rules of Practice and Procedure (Cal. Admin. Code, tit. 8, ch. 4.5, § 10886), which provides:

"Service on Lien Claimants. Where there is on file with the Appeals Board a claim of lien and a compromise and release agreement is filed which proposes the disallowance of the lien in whole or in part, the Appeals Board or referee will either take off calendar and suspend action or disapprove the agreement unless it is accompanied by proof of service of a copy of the compromise and release agreement upon such lien claimant.

"The lien claimant shall have ten days after service upon it of a copy of the compromise and release agreement within which to file and serve upon the parties a protest against the proposal, supported by copies of medical reports, documentary evidence, or offers of proof."

From a practical viewpoint, the parties submitting the settlement should prepare and attach to the settlement papers, documents which compute the lien reduction in accordance with subdivision (c). For the employer and the injured to prepare the formula saves needless delays; if the settlement papers set forth an arbitrary figure without any explanation the medical lien claimant will undoubtedly always object to the amount of the proposed lien reduction. By supplying the suggested formula to the judge, the lien claimant can determine if the suggested reduction complies with section 4903.1. If the lien claimant objects to the suggested reduction, then the judge can compare claimant's suggested reduction with that proposed by the settling parties. In issuing his decision on the lien reduction, the judge may simply incorporate by reference the formula suggested by lien claimant or the settling parties if he is satisfied that the formula computations prepared by the parties are correct. However, the judge may only so incorporate one of the submitted formulas if it fully complies with the requirements of subdivision (c) of section 4903.1.

In the *Gregory* case the formula for reduction of Kaiser's lien was correctly determined by the board to be:

$$\frac{\text{settlement}}{\text{"potential recovery"}} \times \text{lien} = \text{lien recovery}$$

As to how "potential recovery" is calculated, we note that similar problems with determining the proper formula for the calculation for reduction of U.C.D. liens under section 4904 were confronted by the court in *Baird, supra,* 59 Cal.2d 257. The court in *Baird* approved the computation of "total value" to be the sum of permanent disability (plus life pension, if applicable), temporary disability, past medical treatment and estimated future medical treatment. The court noted the "total value" of the injured's claim was computed "as if [the injured] were to prevail in all her contentions." (*Id.,* at pp. 260-261; see also *Oliver* v. *North Kern Hospital* (en banc commission decision (1964) 29 Cal.Comp. Cases 243, 244.)

We do not interpret the words "all . . . contentions" to mean bare assertions unsupported by medical reports or other information available to the parties. Substantial evidence must support the factual basis for determining the "potential recovery." (See *Place* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656]; *Smith* v. *Workmen's Comp. Appeals Bd. (County of Los Angeles)* (1969) 71 Cal.2d 588, 592 [78 Cal.Rptr. 718, 455 P.2d 822].) On legal questions which affect the "potential recovery," it must be found that the legal contentions are not spurious but are legitimate in light of the record.

In light of the decisions of the Supreme Court in *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432], and in *Hegglin* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162 [93 Cal.Rptr. 15, 480 P.2d 967], it is clear that "substantial evidence" requires an examination of the whole record and that "Medical reports and opinions are not substantial evidence if they are known to be erroneous, or if they are based on facts no longer germane, on inadequate medical histories and examinations, or on incorrect legal theories. Medical opinion also fails to support the Board's findings if it is based on surmise, speculation, conjecture, or guess." (*Hegglin* at p. 169.)

Contrary to Kaiser's contention, the application of those rules does not require a determination of the case on its merits. That contention ignores the function of settlements in workers' compensation cases. A compromise and release is a contrasting situation for findings and award. To require the board to determine the "merits" of a proposed settlement would destroy the advantages of settlement. However, that is not to say that the board, in passing on a proposed settlement, may rely on the most extreme medical reports and legal theories. Its function is, on an

examination of the "whole record," disregarding the kind of reports condemned in *Hegglin,* to determine whether that record might reasonably be expected to have resulted in an award to the workman in an amount reasonably supported by the record. That kind of preliminary determination does not require the board to decide what it would have decided after full hearing, findings and award, but only what result it feels it might reasonably have reached; the very nature of a compromise involves a determination which may be either less or more than what award might have resulted after full hearing.

It is proper to point out that the higher the "potential" is in relation to the settlement, the greater the discount which may be taken against the lien claimant. A settlement negotiated between the employer and the workman and without the concurrence of the lien claimant must not be approved by the board unless it is satisfied that the ratio is based upon a reasonable evaluation of the case. That concern gives to the lien claimant some protection against a settlement unduly prejudicial to it.

In substance, we hold that the phrase, "potential recovery," as used in Labor Code section 4903.1, subdivision (c), means the amount of recovery which is *reasonably probable* in a contested proceeding between the applicant-worker and the employer or the employer's insurance carrier—not the highest possible amount of recovery which the applicant could obtain in a contested proceeding. This interpretation of "potential recovery" requires the judge to make a determination of the reasonable value of the applicant-worker's case, which takes into consideration the validity of the various contentions of the applicant and the employer or his carrier and the likelihood of each prevailing on such contentions in a contested proceeding. It is only by interpreting "potential recovery" in this fashion that Labor Code section 4903.1, subdivision (c), is precluded from being deemed arbitrary and capricious and a denial to Kaiser as a lien claimant of its constitutional equal protection and due process rights.

However, where the parties prepare the *Gregory* formula in the hope the judge adopts it, they must set out in some detail those parts of the record which support the computation of the "potential value" of the matter. The simple statement in the formula as to dollar amounts of temporary disability, permanent disability, etc., is inadequate, should the judge adopt such an undocumented *Gregory* formula it would not be in compliance with the requirement of section 4903.1 subdivision (c) that the judge "shall determine the potential recovery." Unlike section 4904

for the reduction of U.C.D. liens, section 4903.1 subdivision (c) has a specific requirement that the judge make such a determination of "potential value."

Without the inclusion of such supporting data, neither the board, nor this court on review, can intelligently determine the correctness of the reduction included in the order approving the compromise.

■ Thus, in proposing the *Gregory* formula, the computation should include: (1) the percentage of disability; (2) the adjustments; (3) the dates of temporary disability; (4) the medical expenses to be reimbursed; and (5) the value and duration of future medical care. These items should be set forth in sufficient detail to assist the lien claimant, the board, and a reviewing court in determining whether the assumed potential value of the claim has been exaggerated.

If the parties fail to provide such an analysis, the judge, if the lien claimant objects to the lien reduction suggested by the parties, must take a similar computation of the *Gregory* formula.

In this case, the board, in computing the formula for the reduction of Kaiser's lien, relied upon figures supplied by the parties in the original settlement papers. Neither the board nor the parties provided the full details as to how such figures were computed. For example, in the *Gregory* case, there is no indication of how the figure of $6,500 in estimated future medical expense was arrived at or how the amount of the temporary disability was computed.

We also feel it is fundamental that, before any lien be reduced under subdivision (c) the group health care plan lien claimant be served with *all* medical reports and other evidence which are before the board in the matter being settled. A group health care plan is entitled to be advised of the evidence supporting the basis for the reduction of its lien. Otherwise, a lien claimant's right to object to the computation of the reduction of its lien is meaningless.

■ Since the board has the power to adopt reasonable rules of practice and procedure (Lab. Code, § 5307), the board may promulgate reasonable regulations providing for the service of medical reports and other evidence upon lien claimants prior to reduction of their liens pursuant to section 4903.1. It would seem reasonable for such reports and

evidence as have not previously been served, to be served upon the lien claimant at the time the settlement papers are forwarded to the board for approval in light of the fact that section 10886 of the WCAB Rules of Practice and Procedure permits the lien claimant only 10 days after service of the settlement papers upon him to object to the lien reduction.

Our analysis of subdivision (c) of section 4903.1 leads to the conclusion that it is not vague and ambiguous. Further, section 4903.1 significantly does not contain any criminal standards or prescribe any duty or standard of conduct for covered lien claimants. (See *Katz* v. *Department of Motor Vehicles* (1973) 32 Cal.App.3d 679, 682 [108 Cal.Rptr. 424].)

■ "In order to be valid, a legislative standard for administrative action need be sufficiently definite only to provide directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers (*In re Marks*, 71 Cal.2d 31, 51 [77 Cal.Rptr. 1, 453 P.2d 441]). Accordingly, legislative standards for administrative acts may be expressed in general terms and need not precisely detail the factors that are to govern the administrative agency and its employees (*Sunset Amusement Co.* v. *Board of Police Commissioners*, 7 Cal.3d 64, 73 [101 Cal.Rptr. 768, 496 P.2d 840])." (*Katz, supra*, 32 Cal.App.3d 679, 684.)

■ The record before us in these four cases shows that there were defects in serving notice of the proposed compromise in some of the cases, in others that action was taken prior to the expiration of the time in which Kaiser was allowed to object; in all of the cases that the documentation served on Kaiser did not comply with the due process requirement that we have set forth in this opinion and in all of the cases the *Gregory* formula did not contain the supporting data that we have held must be included.

## III

### The Equal Protection Issue

In dealing with the equal protection issue, we must, on the record before us, treat separately three of the cases. In *Gregory, Jones* and *Lone,* the record shows that at least one of the matters in dispute, and settled by the compromise, was that of industrial causation. ■ We hold that, in those cases, Kaiser was not denied the equal protection of the laws. In the *Smith* case it is argued that industrial causation was not in issue but the

dispute involved only a question of apportionment. We hold that, if that contention is found true by the board on remand, Kaiser would be denied equal protection by the application of section 4903.1.

 Kaiser contends that section 4903.1 denies equal protection of the laws, is arbitrary and does not bear a rational relationship to any legitimate state purpose.

Section 4903.1 does not apply to all lien claimants that have provided or paid for medical services to an injured for workers' compensation benefits but only applies to such lien claimants who are a "health care service plan, a group disability policy, a self-insured employee welfare plan, or a hospital service contract." In order to evaluate whether section 4903.1 has any equal protection infirmity we must explore the meaning of these terms.

## A

While neither section 4903.1 nor any other part of the Labor Code defines the terms "health care service plan," "group disability policy," "self-insured employee welfare benefit plan" or "hospital service contract," the legislative history of section 4903.1 demonstrates the Legislature's intended meaning of these terms. As originally introduced, Senate Bill No. 573, which became section 4903.1, would have added sections to the Government Code regarding "health care service plans" and added sections to the Insurance Code regarding "group disability policies," "self-insured employee benefit plans" and "hospital service contracts." While these additions to the Government Code and Insurance Code were deleted from the final enactment of Senate Bill No. 573, these proposed additions to the Government Code and Insurance Code demonstrate the Legislature's intended meaning of the various terms. Review of the relevant portions of the Government Code and Insurance Code where these eventually deleted additions were to be made reveals that the terms in question already are clearly defined. By reference to the Government Code, Health and Safety Code sections 1340-1395 define and cover "health care service plans." Insurance Code sections 10270, subdivision (c)(3), 10270.5, 10270.505, and 10270.57 delineate "group disability policies." Insurance Code section 10121, subdivision (c) defines "self-insured welfare benefit plan." A hospital service contract" is covered in Insurance Code sections 11491-11516.5. Thus, the terms "health care service plan,"

"group disability policy," "self-insured employee welfare benefit plan," and "hospital service contract" (hereinafter collectively called Group Health Care Plans) are not vague terms but are precisely defined by statute.

## B

Kaiser's equal protection argument stems from the fact that section 4903.1 obviously treats the Group Health Care Plans dramatically differently from other medical lien claimants.

Categorization of Group Health Care Plans differently from other medical lien claimants cannot be said to create a suspect classification invoking the strict scrutiny doctrine. (See *Meredith* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 777, 780 [140 Cal.Rptr. 314, 567 P.2d 746]; see also, *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395 [138 Cal.Rptr. 293, 563 P.2d 849].) Therefore, in determining the equal protection challenge to section 4903.1, the rational relationship test is to be applied. This is the same test that has been applied by the courts in determining equal protection challenges to benefit classifications under the Workers' Compensation Act. (*Meredith* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 777, 781; *Mathews* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 738-740 [100 Cal.Rptr. 301, 493 P.2d 1165]; *Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 702-703 [159 P. 721]; *Saal* v. *Workmen's Comp. Appeals Bd.* (1975) 50 Cal.App.3d 291, 300 [123 Cal.Rptr. 506]; but cf. *Arp* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395.)

■ Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it. We presume the legislative classification is valid and will sustain it unless it is manifestly without support in reason. (*Meredith* v. *Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 777, 781; *Mathews* v. *Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d 719, 738-740; *Saal* v. *Workmen's Comp. Appeals Bd., supra,* 50 Cal.App.3d 291, 300.)

■ The classification of Group Health Care Plans cannot be said to be arbitrary. The inclusion of all medical lien claimants in section 4903.1 would undoubtedly result in the reluctance by many physicians and hospitals to treat any cases where there is any possibility of industrial injury. Group Health Care Plans are in a different position. Generally, Group Health Care Plans are in the position of having no discretion to deny treatment to a person covered under its medical plan while the question of industrial injury is being litigated. (See *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103].) Further, Group Health Care Plans are a distinct group. They operate under agreements to provide or pay for the medical services required by the insured or subscriber for a periodic premium paid by or on the behalf of the injured. They *can* exclude from coverage treatment for injuries that are compensable under the workers' compensation laws. While they have the right to file a lien in workers' compensation cases for the reasonable value of the medical services provided or paid for by them for the industrial injury (Lab. Code, § 4903 subd. (b); see also *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d 452) just as can any physician or hospital, unlike the doctor or hospital that charges an injured directly for the value of services rendered and can still seek payment from the injured in the event the injured turns out not to be entitled to workers' compensation benefits, Group Health Care Plans cannot proceed against the injured personally in the event the injury is not compensable under the workers' compensation laws.

Kaiser argues that section 4903.1, subdivision (c), has no rational relationship to a legitimate state purpose. The court's language in *Baird, supra,* 59 Cal.2d 257, 269, answers this contention: "The Legislature has encouraged compromises. (Lab. Code, § 5000.) Now to permit a third party, a lien claimant who asserts no right to recoupment at all in the absence of a workmen's compensation proceeding, to interfere with the settlement and force the rendition of findings would be to nullify the procedure for compromise. [¶] . . . A submission to the [appeals board], for its final determination, of a proposed basis for settlement is highly desirable, and the Legislature had manifested its intent to implement it. . . ."

Kaiser ignores the valuable role of settlements. Not all claimed injuries are compensable. The obvious reason for permitting settlements is to give the injured the opportunity of receiving some "payment" for his or her

claimed injury when otherwise if he or she went to a hearing benefits might be totally denied by the board.[7]

In case the hearing results in a total denial of benefits to the workman, the Group Health Care Plan will be without recourse for the medical services provided, since its contract with the workman requires it, in consideration of the premium charged, to absorb the entire cost of its services. The other providers of medical and hospital services, however, may, at their option, either refuse to provide services without prior payment or (if they regard the prospective patient as financially responsible) rely on payment from him (or on his account) if they do not recover out of his workers' compensation benefits. The effect of the approval of a compromise and action by the board under subdivision (c) is, thus, to give the Group Health Care Plan, like the workmen, some payment.

However, where there is no legitimate dispute as to industrial causation, the group medical provider stands in a different position. If the injury or illness was industrially caused, the workman will always be entitled to at least care and treatment at the employer's expense and if the workman, after due notice to the employer, is entitled to obtain that care and treatment from his own medical provider, the employer will be required to pay the full value of the services necessarily provided. In such a case, the group medical provider will be entitled to a lien for the full amount of its legitimate claim, irrespective of whether other issues may exist between the employer and the workman.[8] Thus, unlike a case in which industrial causation is in issue, the medical provider is not in a total win or loss position. To require it to accept a reduction of its lien, under those circumstances, would be without any compensating consideration to the provider. Thus section 4903.1 cannot constitutionally be applied in cases where there is no dispute over industrial causation or over the right to recover for self-procured medical care.

In determining whether industrial causation is legitimately in issue, it is not determinative that the employer, in his original opposition to the claim, set forth that matter as a defense. Rightly or wrongly, many

[7]While section 4903.1 subdivision (c), has been interpreted to mean the employer and the injured can settle around the Group Health Care Plan lien claimant (*Permanente Medical Group* v. *Workers' Comp. Appeals Bd.* (1977) 73 Cal.App.3d 135 [140 Cal.Rptr. 612]), employers are often reluctant to settle cases piecemeal.

[8]We note that there are other cases, such as a denial because of statute of limitations or a finding of independent contractor, in which a similar win or loss situation may exist. The cases at bench do not involve those issues and we do not here decide them.

counsel, in filing a defense either before the board or in a lawsuit, throw in every conceivable defense. As a case goes forward, it often develops that some of those defenses are not actually urged. In the case of a workman's compensation claim, the board must look at the actual state of that case, as developed by medical or other evidence and determine whether, at the time a compromise settlement is presented to it, what defenses originally pleaded are still actually ones that the employer will litigate to a conclusion absent a compromise.

Because, for the reasons above set forth under rubric II, the procedure followed by the board in all four cases denied Kaiser due process of law, the awards are annulled and the cases are remanded to the board for further proceedings consistent with this opinion. In the *Smith* case (Civ. No. 50921) the board shall determine whether, applying the standards herein set forth, industrial causation was actually in issue when the compromise was tendered for approval. In all four cases Kaiser or the employer may litigate any dispute over the gross amount of its legitimate claim.

Files, P. J., and Jefferson (Bernard), J., concurred.

The petitions of respondents Smith, Workers' Compensation Appeals Board and Industrial Indemnity Company for a hearing by the Supreme Court were denied February 14, 1979.